ARNOLD P. PETER (SBN 120091)
appeter@prslawyers.com
PETER, RUBIN, & SIMON, LLP.
9100 Wilshire Boulevard, Suite 880W
Beverly Hills, California 90212
Telephone: (310) 277-0010
Facsimile: (310) 432-0599

Attorneys for Cross-Plaintiffs
PRS MEDIA PARTNERS, LLC and
RICK NORSIGIAN

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE ANSEL ADAMS PUBLISHING RIGHTS TRUST, a California partnership, <br><br> Plaintiff. <br><br> v. <br><br> PRS MEDIA PARTNERS, LLC, a California Limited Liability Company; RICK NORSIGIAN, an individual, <br><br> Defendants. <br><br> PRS MEDIA PARTNERS, LLC, a California Limited Liability Company; RICK NORSIGIAN, an individual, <br><br> Counter-Plaintiffs, <br> v. <br><br> THE ANSEL ADAMS PUBLISHING RIGHTS TRUST, a California Partnership; WILLIAM TURNAGE, in his official capacity as Managing Director of The Ansel Adams Publishing Rights Trust; THE UNIVERSITY OF ARIZONA; and DOES 1-10, <br><br> Counter-Defendants. | Case No. 10-CV-03740-JSW <br><br> Hon. Jeffrey S. White <br><br> **FIRST AMENDED COUNTERCLAIM FOR:** <br><br> 1. **SLANDER;** <br> 2. **UNFAIR COMPETITION UNDER CALIFORNIA LAW;** <br> 3. **DEFAMATION;** <br> 4. **TRADE LIBEL;** <br> 5. **CIVIL CONSPIRACY;** <br> 6. **AIDING AND ABETTING TORTIOUS INTERFERENCE WITH A PROSPECTIVE ECONOMIC ADVANTAGE.** <br><br> **DEMAND FOR JURY TRIAL** |

1
**FIRST AMENDED COUNTERCLAIM**

PRS MEDIA PARTNERS, LLC and RICK NORSIGIAN, by and through its undersigned counsel, state and allege as follows:

I

**JURISDICTION AND VENUE**

1. The underlying complaint was filed for: (a) trademark infringement/false designation of origin/unfair competition, false advertising and false endorsement arising under 15 U.S.C. § 1125(a); (b) trademark dilution arising under 15 U.S.C. § 1125(c); (c) violation of right to publicity under California law arising under Cal. Civ. Code § 3344.1; (d) false advertising under California law arising under Business & Professions Code § 17500 et seq; (e) trademark dilution arising under California Cal. Civ. Code § 14247 et seq.; (f) unfair competition arising under California Business & Professions Code § 17200 et seq.; (g) California common law trademark infringement; and (h) unfair competition arising under the common law of the State of California.

2. The claims asserted in this Counterclaim arise under the common law of the State of California. This Court has original jurisdiction over the federal trademark claims asserted in the Complaint pursuant to 28 U.S.C. §§ 1331 and 1338, §§ 39 and 43(a) of the Lanham Act, 15 U.S.C. §§ 1114 and 1125(a), and supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over the claims in the Counter-Complaint, arising under the common law of the State of California and that form part of the same case or controversy.

3. Venue is proper in this Judicial District pursuant to 28 U.S.C. §§ 1391(a), (b), and (c).

II

**THE PARTIES**

4. Counter-Plaintiff PRS MEDIA PARTNERS, LLC ("PRS Media"), is a California Limited Liability Company, with its principal place of business in Beverly Hills, California.

5. Counter-Plaintiff RICK NORSIGIAN ("Norsigian") is an individual, residing in Fresno, California.

6. Counter-Defendant THE ANSEL ADAMS TRUST ("Trust") is a California partnership, with its principal place of business in this District.

PETER, RUBIN, & SIMON, LLP.
9100 Wilshire Boulevard, Suite 880W
Beverly Hills, California 90212

7. Counter-Defendant WILLIAM TURNAGE ("Turnage") is the Managing Director of Counter-Defendant Trust, and is named herein in his representative capacity only.

8. Counter-Defendant the UNIVERSITY OF ARIZONA, a public entity form unknown, located in Tucson, Arizona. Counter-Plaintiffs have filed an administrative claim with the Arizona Attorney General's office concurrently with this First Amended Counterclaim.

III

**FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS**

**Discovery Of The Negatives And The Authentication Process**

9. In 1937, a fire ripped through the darkroom of iconic photographer, Ansel Adams, destroying as many as 5,000 glass-plate negatives. This loss represented one-third of his portfolio, and many of the negatives had never been developed into photographs. This critical void in Adams' collection of photographs remained until the spring of 2000, when Counter Plaintiff, Rick Norsigian, chanced upon two boxes of antique glass negatives at a garage sale in Fresno, California. Deteriorating from old age, manila envelopes housed glass photographic negatives wrapped in newspaper. The negatives were of a unique size—the same size used by Adams during his prolific career—and the manila envelopes were marked with handwriting, which catalogued the date and location of each image represented on the glass.

10. With these facts in play, the question that was submitted to a team of experts was whether these negatives where in fact created by Ansel Adams. The panel of experts included:

A. Michael Nattenberg and Marcel Matley, two handwriting analysts and experts, both of whom had previously been qualified to testify in both state and federal courts;
B. George Wright, an experienced meteorologist with an advanced degree in meteorology and a Certified Consulting Meteorologist by the American Meteorological Society, having previously served as an expert at both trials and depositions;
C. Patrick Alt, a large format photographer with over 40 years of applied experience with the same types of cameras that Adams utilized when he created his glass negatives;
D. Robert Moeller, former Curator of the Boston Museum of Art and Director of the Duke University Art Gallery;

E. Thomas Knowles, a former agent and Director for the United States Federal Bureau of Investigation;

F. Manny Medrano, a former Assistant United States Attorney with over 100 jury trials.

11.  In July, 2010, after an extensive period of examination and study by the individuals listed above, Counter-Plaintiffs, Norsigian and PRS Media Partners, announced that the group of experts had unanimously concluded that the negatives were created by Ansel Adams. The conclusion of the panel of experts was based on the following findings:

A. The handwriting of Virginia Adams, Ansel Adams' wife, was identified the manila envelopes in which the negatives were found.

B. One of the images in the Norsigian Collection is virtually identical to an authenticated Ansel Adams photograph.

C. The two virtually identical photographs were taken by Ansel Adams and not a second photographer.

D. The apparent fire damage to some of the negatives linking them to the 1937 studio fire mentioned above.

E. Tracing the negatives to Southern California is consistent with the time Ansel Adams spent teaching at what is now known as the Pasadena Art Center.

F. Several of the images in the Norsigian negatives correspond to iconic locations shot by Ansel Adams.

G. The glass plate negatives are of a rare size that was used by Ansel Adams during his career.

H. Former FBI agent, Thomas Knowles (named above), and former Assistant United States Attorney, Manny Medrano, concluded that, based on their own assessment of the forensic evidence, and applying the "beyond a reasonable doubt" standard utilized in criminal trials, that the evidence as to whether the negatives were created by Ansel Adams was overwhelming.

PETER, RUBIN, & SIMON, LLP.
9100 Wilshire Boulevard, Suite 880W
Beverly Hills, California 90212

**Counter-Defendant's Defamatory Statements**

12. Shortly after the results of the investigation were announced, Turnage, speaking in his official capacity as Managing Trustee of the Trust, emphatically stated that Norsigian and those working with him were "crooks" and "con men," in comments reported internationally by CNN. (Ex. 1). Turnage further stated that Rick Norsigian and his team were telling a "big lie," and analogized Norsigian's authentication efforts to the propaganda techniques used in Nazi Germany by Adolf Hitler. *Id.*

13. The Ansel Adams legacy is controlled by Cross-Defendant Trust and the Ansel Adams Gallery ("Gallery"), which is operated by Adams' grandson, Matthew Adams. Direct sales through the Gallery and licensing of varied forms of merchandise have generated millions of dollars.

14. Matthew Adams, and individuals associated with and/or employed by the Gallery and Trust, have raised various objections and offered alternate theories as to the provenance of Norsigian's collection of glass plate negatives, advocating that the negatives cannot be the work of Ansel Adams. Matthew Adams subsequently clarified that he possesses no professional expertise with regards to authentication, much less a level of expertise similar to the qualifications of the experts retained by Norsigian. He further clarified that he did not engage any experts to address his doubts with respect to the authenticity of the Norsigian negatives. His comments, therefore, are merely his lay opinion, and are not based on any professional expertise.

15. Thus, the Trust sought to derive a direct competitive advantage by knowingly, intentionally, and maliciously defaming Norsigian, and by disparaging his efforts, as well as those of whom he engaged, to authenticate, appraise, and sell the glass plate negatives, or any prints developed therefrom. The dual-pronged approach of raising unverified doubts as to the authenticity of Norsigian's collection, combined with the widespread dissemination of defamatory statements, was manifestly designed to harm and injure Norsigian, both personally, and professionally in his venture to sell his negatives and prints.

16. The damage of such unprivileged defamatory statements continues to this day.

**The Formation of The Conspiracy And Acts In Furtherance Thereof**

17. On July 27, 2010, Norsigian announced the results of his expert panel. The very same day, Katherine Martinez ("Martinez"), Director of the Center for Creative Photography ("CCP") (a division of the University of Arizona Libraries, where Ansel Adams archives are maintained) recognized that the "CCP staff should not be drawn into the debate about the negatives." Email By Katherine Martinez, July 27, 2010, 11:31 a.m. (Ex. 2). Martinez's reticence was not rooted in the fact that Norsigian's glass negatives had not been studied by anyone at the CCP, but rather, that "associating the CCP with [Norsigian's] claim [would] only benefit the seller [Norsigian]." *Id.* Thus, from the outset, the CCP's agenda was motivated by a desire to avoid benefitting Norsigian in any way. This agenda quickly evolved into a nefarious conspiratorial effort to discredit Norsigian, and devalue his collection of glass negatives.

18. By noon of that same day, Martinez and CCP employees were scrambling to contact Turnage, managing Trustee of the Trust, while he vacationed in Hawaii thousands of miles away. Email by Katherine Martinez, July 27, 2010, 12:01 p.m. (Ex. 3). Martinez's apparent purpose was to seek counsel from Turnage on how to respond to inquiries from the press concerning Norsigian's rare glass-negative collection.

19. Martinez's correspondences were copied to individuals at the highest echelons of the University Of Arizona ("University"), including: (i) Dr. John P. Schaefer, President emeritus of the University and sitting board member of the Trust ("Dr. Schaefer"); and (ii) Carla J. Stoffle, Dean of University Libraries and the Center for Creative Photography ("Stoffle"). (Ex. 1 – 3).

20. By 3:00 p.m. on July 27, Ms. Martinez had spoken to Turnage, who declared that it was "essential" that the CCP staff speak to the media and publicly state that Mr. Norsigian's negatives were not created by Ansel Adams. Email by Katherine Martinez, July 27, 2010, 2:58 p.m. (Ex. 4). However, both Martinez and Stoffle disagreed with Turnage and confirmed that it was "up to the [Adams] family and the Trust to respond to the press." *Id.* Specifically, Martinez recognized the legal implications of espousing a position at the behest of the Trust, when she stated that "the Center needs to avoid the risk of being sued by the owner." *Id.* Martinez decided not to share "this difference of opinion [between the CCP and Turnage] with [her] staff." *Id.*

PETER, RUBIN, & SIMON, LLP.
9100 Wilshire Boulevard, Suite 880W
Beverly Hills, California 90212

PETER, RUBIN, & SIMON, LLP.
9100 Wilshire Boulevard, Suite 880W
Beverly Hills, California 90212

21. By August 15, 2010, Martinez advised both Turnage and Dr. Schaefer that "the [CCP] staff and [she] would continue to remain silent about [Mr. Norsigian's] claim." Email from Katherine Martinez, August 15, 2010, 9:25 a.m. (Ex. 5). The University has produced only a single telephone log reflecting a call Turnage made to the CCP, in which he insisted that the CCP adopt the position of the Trust. Research Center Telephone Log, Entry of August 9, 2010 (Turnage demanding that the CCP "concur in what we said" because "my good name is being smirched [sic.].") (Ex. 6).

22. Angered by Martinez's decision not to comment on Norsigian's collection, Turnage responded with what can only be described as a tirade, where he threatened to use his influence as a means of discrediting the CCP in a bi-coastal smear campaign. Email from William Turnage, August 15, 2010, 9:48 a.m. (Ex. 5). In his email, Turnage refers to Martinez's decision as a "cynical BS copout" and announced that he will be ending his "34 years of support and assistance for the CCP and will become a public critic in SF and NYC." *Id.* Turnage further noted that he would be writing Martinez "a letter she will not forget" and concluded that he was "appalled and disgusted by this cowardice and excuse-making [on the part of the CCP]." *Id.*

23. Upon information and belief, and consistent with its pro-Trust agenda, the University and the CCP have wrongfully denied Counter-Plaintiffs of additional public documents to which they are entitled under § 39-121.02 of the Aizona Public Records Act. As such, no additional documents have been produced by the University's custodian of records for the time period between August 15, and August 31, 2010, when the CCP finally relented to the Trust, and publicly announced, both in a press release and on the World Wide Web, that "[w]e have no reason to believe that these negatives are, in fact, the work of Ansel Adams, and we support the efforts of the Ansel Adams Publishing Rights Trust to Protect its rights in this matter." Email from Katherine Martinez, August 31, 2010, 2:30 p.m. (Ex. 7 - 8).

24. Despite successful efforts to pressure a public entity into acquiescing to their demands, Turnage and the Trust were still not satisfied with this statement of support, and responded to Ms. Martinez as follows:

> While this rather anodyne statement represents a small step towards fulfilling the CCP's responsibility to Knowledge [sic.] and to the photographers whose archives it has undertaken

to preserve and make available for study, the fact that it took a month to "surface" renders it of marginal utility.

Email from William Turnage, August 31, 2010, 3:16 p.m. (Ex. 9)

25. Clearly recognizing that the CCP's public statement was made in furtherance of the Trust's patent scheme to discredit Norsigian and his collection (which neither the CCP nor the Trust has never examined), The Dean of Libraries confirmed the CCP's tacit, yet resentful, cooperation:

> I have kept the CCP from responding. Leslie [Calmes] is not employed to authenticate anything and as such the university has no responsibility to hire her a lawyer should she get sued.
>
> *You got the best we can do and are going to do. Probably more than we should have.* There is nothing in the deed of gift that says we have to hire people who can authenticate negatives or images. We always appreciate your support and feel bad when you are unhappy.

Email from Carla Stoffle, August 31, 2010, 3:39 p.m. (Emphasis added) (Ex. 9). This admonishment was inconsequential, as damage from what Turnage and the Trust demanded had already been inflicted, and the main purpose of the conspiracy—to discredit Norsigian and PRS Media—had already been achieved with the complicity of the CCP.

26. The CCP is a public institution and exists to serve the public interest, not any single vested interest. As the CCP declared in its statement of support for the Trust: "[T]he Center for Photography [sic] is the preeminent research archive for study of photography and photographic history in North America." Statement previously posted on the CCP Website Home Page, http://www.creativephotography.org, last accessed on September 1, 2010 (Ex. 8). Contrary to its mission statement, which includes "respect for a diversity of viewpoints," the CCP participated in a conspiracy to promote the unsubstantiated viewpoint of the Trust, and, aided and abetted the Trust to carry out its various tortious intentions towards Counter-Plaintiffs.

27. Upon information and belief, the above mentioned conduct is the offspring of an ongoing conspiracy to interfere with Counter-Plaintiffs' economic activities, create an unfair

PETER, RUBIN, & SIMON, LLP.
9100 Wilshire Boulevard, Suite 880W
Beverly Hills, California 90212

business advantage, and use a public entity as a proxy to serve a private business interests (the Trust).

28.   Shortly after the July 27, 2010 announcement by Norsigian, Martinez stated what was and should have remained the policy of the CCP—to abstain from the public debate concerning the authenticity of Norsigian's negatives.  The fact that the CCP allowed its academic integrity to be compromised by an aggressive, for-profit partnership, is reprehensible and unbecoming of a leading research university.

29.   The CCP's derogation of duty to the public is an affront to Counter-Plaintiffs' future efforts to authenticate an art collection of great potential value.  Namely, it chills the efforts of Counter-Plaintiffs', and those similarly situated, to compare their images, negatives, or other documents, to those held at the CCP—the sole comprehensive archive of Ansel Adams photography and negatives.

30.   As a result of the coordinated actions of Counter-Defendants, Counter-Plaintiffs are constructively enjoined from using a one-of-a-kind public resource, which is funded by U.S. tax dollars, to further aid their economic and other activities.

31.   Counter-Defendants' actions are a wanton breach of academic standards, and severely diminished, and continue to diminish, the value of the Norsigian collection, thereby directly causing harm to Counter-Plaintiffs' professional endeavors.

### FIRST CLAIM FOR RELIEF

**(By Rick Norsigian Against The Ansel Adams Publishing Rights Trust)**

**(Slander)**

**(Cal. Civ. Code § (46))**

32.   Counter-Plaintiff, Rick Norsigian, realleges and incorporates the allegations of paragraphs 1 through 31, as if fully set forth herein.

33.   On or about July 28, 2010, Turnage maliciously made the following false and unprivileged, defamatory statements concerning Counter-Plaintiff Rick Norsigian:

PETER, RUBIN, & SIMON, LLP.
9100 Wilshire Boulevard, Suite 880W
Beverly Hills, California 90212

A. Cross-Defendant and those working with him are "a bunch of crooks" who "are pulling a big con job."

B. Describing one of the experts engaged by Counter-Defendant as a "so-called expert that nobody has ever heard of from Jackson Hole, Wyoming. They had to go out into the boonies to dig him up."

C. Counter-Defendants' strategy is to line up a long list of hired experts to tell "a big lie."

D. "Hitler used that technique. You don't tell a small one. You tell a big one."

34. These statements were made with the intent and certain knowledge that they would be reprinted in the print and other media.

35. In publishing his statements to the press, Turnage, in his capacity as managing trustee of the Trust, knew that such statements were false or acted with reckless disregard of falsity thereof.

36. Said statements identified Rick Norsigian, and/or were understood by the public to refer to him directly, and were reported as such in numerous media outlets.

37. The statements hereinabove are defamatory on their face because they have a tendency to injure Counter- Plaintiff in his trade, business, and financial interests.

38. Counter-Defendant's willful, malicious, intentional, and unprivileged conduct, exposed Counter-Plaintiff, Rick Norsigian, to hatred, contempt, ridicule, and obloquy.

39. As a proximate result of Counter-Defendant's defamatory statements, Counter-Plaintiff has suffered great mental anguish and has been, and from henceforth will be, greatly injured and prejudiced in his social and professional reputation, and has lost, and will continue to lose and be deprived of, gains and profits which would otherwise have accrued to him.

40. Cross-Defendants' acts were committed with fraud, willfulness, wantonness, malice, and oppression, entitling Cross-Plaintiff to an award of actual damages, plus punitive damages, in a presently unspecified sum and dependant in part on Counter-Defendant's net worth, all to be shown at trial. Such damages should be awarded to Counter-Plaintiff, Norsigian, along with the imposition of a constructive trust over the assets, and over the assets ultimately traceable to the assets.

## SECOND CLAIM FOR RELIEF

(By All Counter-Plaintiffs Against All Counter-Defendants)

(Unfair Competition Under State Law)

(Cal. Bus. & Prof. Code § 17200 *et seq*)

41. Counter-Plaintiffs reallege and incorporate by reference the allegations in paragraphs 1 through 40, as if fully set forth herein.

42. Counter-Plaintiffs have been damaged and will continue to be damaged by the Trust's false and unlawful statements, as well as by the CCP's unfounded endorsement of the Trust's position. Counter-Plaintiffs have, and will continue to be damaged by Counter-Defendants' unfair and misleading acts, which were designed to injure Counter-Plaintiffs' business reputation.

## THIRD CLAIM FOR RELIEF

(Against the Trust by Counter-Plaintiff Rick Norsigian)

(Defamation)

(California Common Law)

43. Counter-Plaintiffs reallege and incorporate by reference the allegations in paragraphs 1 through 42, as if fully set forth herein.

44. By and through the actions set forth above, Counter-Defendant's acts constitute defamation under California common law.

45. In performing the conduct described herein, Turnage acted with malice and oppression, when he made defamatory statements of and concerning Norsigian with knowledge of falsity and/or reckless disregard for the truth of said statements. Turnage published these defamatory statements with the intent and certain knowledge that they would be reprinted and republished in online, print and other media.

## FOURTH CLAIM FOR RELIEF

### (By All Counter-Plaintiffs Against the Trust)

### (Trade Libel)

### (California common law)

46. Counter-Plaintiffs reallege and incorporate by reference the allegations in paragraphs 1 through 45, as if fully set forth herein.

47. By and through the actions set forth above, Counter-Defendant's acts constitute trade libel and unfair competition under California common law.

48. In performing the conduct described hereinabove, Counter-Defendant acted with oppression and malice, and with intent to disparage and injure the quality of Counter-Plaintiffs' property and business trade, including, *inter alia*, by attempting to stigmatize Counter-Plaintiffs' efforts to appraise and monetize such property.

## FIFTH CLAIM FOR RELIEF

### (By All Counter-Plaintiffs Against All Counter-Defendants)

### (Civil Conspiracy To Interfere With A Prospective Economic Advantage)

### (California Common Law)

49. Counter-Plaintiffs reallege and incorporate the allegations of paragraphs 1 through 48, as if fully set forth herein.

50. By and through the actions set forth above, Counter-Defendants agreed to, entered into, and formed a conspiracy to engage in unlawful conduct designed to injure Cross-Plaintiffs.

51. By and through the actions set forth above, Counter-Defendants engaged in acts pursuant to, and in furtherance of, said conspiracy.

52. Counter-Defendants' acts were committed with fraud, willfulness, wantonness, malice, and oppression, entitling Cross-Plaintiffs to an award of actual damages, plus punitive

damages, in a presently unspecified sum and dependant in part on Counter-Defendants' net worth, all to be shown at trial. Such damages should be awarded to Counter-Plaintiffs, along with imposition of a constructive trust over the assets, and over the assets ultimately traceable to the assets.

### SIXTH CLAIM FOR RELEIF

**(By All Counter-Plaintiffs Against the University of Arizona)**

**(Aiding and Abetting Tortuous Interference With a Prospective Economic Advantage)**

**(California Common Law)**

53. Counter-Plaintiffs reallege and incorporate the allegations of paragraphs 1 through 52, as if fully set forth herein.

54. By and through the actions set forth above, Counter-Defendant, the University of Arizona, knowingly and consciously gave substantial assistance to the Trust in its tortuous and wrongful activities, and is thus responsible as a joint tortfeasors for all ensuing damages inflicted upon Counter-Plaintiffs.

55. **Wherefore, plaintiff prays for relief as follows:**

56. An award of actual damages, plus interest at the maximum legal rate, in a sum to be proved at trial.

57. Punitive damages in a sum to be proved appropriate at trial;

58. Costs of corrective advertising;

59. Costs of suit; and

60. Such other and further relief which the Court views as proper.

Dated: December 28, 2010                    Respectfully submitted,

                                            PETER, RUBIN AND SIMON, LLP.


                                            By: __/s/ Arnold P. Peter_____
                                            Arnold P. Peter
                                            Attorneys for Cross-Plaintiffs
                                            PRS MEDIA PARTNERS, LLC and RICK NORSIGIAN

PETER, RUBIN, & SIMON, LLP.
9100 Wilshire Boulevard, Suite 880W
Beverly Hills, California 90212

## DEMAND FOR JURY TRIAL

Cross-Plaintiffs hereby demand a jury trial on all issues.

Dated: December 28, 2010                    Respectfully submitted,

                                            PETER, RUBIN AND SIMON, LLP.

                                            By: /s/ Arnold P. Peter
                                            Arnold P. Peter
                                            Attorneys for Cross-Plaintiffs
                                            PRS MEDIA PARTNERS, LLC and RICK NORSIGIAN

PETER, RUBIN, & SIMON, LLP.
9100 Wilshire Boulevard, Suite 880W
Beverly Hills, California 90212